UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

BMC Software, Inc.,                                    Case No. 15-cv-2583 (PAM/TNL)

                        Plaintiff,

v.                                                                  **MEMORANDUM AND ORDER**

Christopher Mahoney,

                        Defendant.
_____

This matter is before the Court on BMC's Motion for a Preliminary Injunction.[1]

For the reasons that follow, the Court grants the Motion to the extent ordered below.

**BACKGROUND**

This case centers on the enforceability of a noncompete agreement. BMC

Software, Inc. is bringing the lawsuit against a former, top-performing regional sales

manager, Christopher Mahoney, for leaving the company to work at its biggest

competitor as a global sales manager. Many of the relevant facts are disputed.

**A.      Background on BMC**

BMC develops, sells, and maintains software for companies around the world.

(Hardy Decl. (Docket No. 8) ¶ 3.) The more than 800 software products, spread across

five product lines, are designed to optimize and monitor companies' system applications.

---

[1] BMC styles its Motion as one for a temporary restraining order. But because Mahoney
has been notified of the Motion and the Motion has been (voluminously) briefed and
heard, the Court will treat the Motion as one for a preliminary injunction. See Fed. R.
Civ. P. 65(a)-(b). The Court must also comment on Mahoney's counsel's evasion of the
Local Rule's word-count limit in his submissions. See D. Minn. L.R. 7.1(f). It is
contrary to the spirit, if not the letter, of the Rule to file a nearly 10,000-word, 38-page
brief that includes no fact section but rather a nearly 10,000-word, 45-page affidavit.

(Id. ¶¶ 3, 6.)   BMC offers its software through offices in 30 countries, including the United States and Canada.  (Id. ¶ 3.)

**B.      Mahoney's Employment at BMC**

During his employment with BMC, Mahoney held different positions in various locations, first as a corporate account manager in Canada and then as a regional sales manager in the United States.

**1.      Corporate Account Manager in Canada**

In January 2010, BMC Software Canada, Inc., a subsidiary of BMC, hired Mahoney as a corporate account manager in Canada.  (Olmo Decl. (Docket No. 11) ¶ 7; Mahoney Aff. (Docket No. 16) ¶ 10.)  Before he started the position, Mahoney signed two contracts with BMC Canada: (1) an employment agreement, which addresses compensation and other terms of the position (Mahoney Aff. Ex. 1); and (2) a confidentiality agreement, which includes nondisclosure and noncompete provisions and is, for the purposes of this Motion, identical to a confidentiality agreement that he would sign in 2012 (Olmo Decl. Ex. A).

As a corporate account manager, Mahoney sold software to customers in Eastern Canada.  (Mahoney Aff. ¶ 17.)  To enable him to do so, BMC Canada gave Mahoney access to, according to BMC, substantial and detailed confidential information.  (Andrew Decl. (Docket No. 10) ¶ 6.)   For example, Mahoney could view sales plays, differentiation statements, and financial data about existing and new products; contact information and contract data for current and prospective customers; and contact information for decisionmakers of resale partners.  (Id. ¶¶ 7-10.)  He also participated in a

2

three-month training course that exposed him to the "MEDDIC" sales process.  (<u>Id.</u> ¶ 12.)

Mahoney disagrees that this information was confidential, contending that it was publicly

available and generally known in the industry.  (Mahoney Aff. ¶ 17.)

### 2. Regional Sales Manager in the United States

In September 2012, BMC offered Mahoney a promotion to sales manager for the

Midwestern region of the United States.  (Olmo Decl. ¶ 9; Mahoney Aff. ¶¶ 20-21.)  He

accepted the offer and moved, along with his wife and two children, to Minnesota.

(Mahoney Aff. ¶¶ 23, 26-28.)   Unlike his position in Canada, Mahoney's new

employment was at will.  (<u>Id.</u> Ex. 4.)

A month later, in October 2012, BMC sent Mahoney another confidentiality

agreement, the version at issue here.  (Pham Decl. (Docket No. 18) ¶ 6.)   That

confidentiality agreement contains several relevant provisions.  (Olmo Decl. Ex. B.)

First, a definition section recognizes the confidential nature of information related to

software, business procedures, legal rights, marketing plans and customer lists,

employment data, and third-party proprietary information.   (<u>Id.</u> at 1.)   Next, an

obligations clause acknowledges that BMC would give Mahoney access to that

confidential information throughout his employment.  (<u>Id.</u>)  Further, a nondisclosure

clause explains that Mahoney would not disclose and prevent the disclosure of the

confidential information during and after his employment.  (<u>Id.</u> at 2.)  And finally, a

noncompete covenant pledges that Mahoney would not engage in either of the following

activities for one year after leaving BMC:

3

[1] solicit or sell products or services that are competitive with any existing BMC product or service, or any product or service under development at the time of [his] employment with BMC, to any customer of BMC for which [he was] personally responsible or with whom [he] had direct contact by virtue of [his] employment with BMC in the two years preceding [his departure]; [or]

[2] take part in, become employed for the purposes of, or assist with any research, development, or marketing of any products or services that are competitive with any existing BMC product or service, or any product or services under development at the time of [his] employment with BMC, within the geographic scope of the United States.

(Id. at 3-4.)  The confidentiality agreement selects Texas law to govern its provisions.

(Id. at 6.)  Though at the time Mahoney believed the agreement was not enforceable against him, he signed it in November 2012.  (Id.; Mahoney Aff. ¶ 36.)

BMC compensated Mahoney with not only salary, benefits, and bonuses, but also incentive pay as reflected in deferred compensation agreements.  (Olmo Decl. ¶ 11, Ex. C.)  The deferred compensation agreements grant Mahoney specific stock units and cash awards subject to a vesting schedule and other terms.  (Id. Ex. C.)  In particular, the latest agreement includes a claw-back provision that allows BMC to recover some of the awarded compensation if Mahoney violated certain noncompete conditions.  (Id. at 3-4.) The agreement also contains a merger clause that states the agreement "constitutes the entire agreement between [Mahoney] and [BMC] with respect to the subject matter of" the agreement.  (Id. at 9.)  The deferred compensation agreements likewise select Texas law to govern their provisions.  (Id.)  Mahoney signed the agreements in November 2012 (two weeks before he signed the confidentiality agreement), May 2013, July 2013, October 2013, May 2014, and December 2014.  (Olmo Decl. ¶ 12.)

4

Beyond the above facts, the parties cannot seem to agree on much else about Mahoney's tenure as regional sales manager.  The parties dispute the magnitude of his role.  BMC alleges that Mahoney oversaw the company's top 40 customer accounts in Minnesota, Illinois, Wisconsin, and Iowa.  (Hardy Decl. ¶ 4.)  BMC contends, however, that because those customers have a national presence and Mahoney was the only regional sales manager who covered the accounts, his role was effectively national in scope.  (Id.)  BMC further alleges that Mahoney interacted with 26 employees and led a sales force of seven employees.  (Id.)  Mahoney counters that his customer base reached to North Dakota and South Dakota as well, but that BMC reduced his coverage to 29 accounts in April 2014.  (Mahoney Aff. ¶¶ 34, 37.)

The parties dispute Mahoney's duties in that role.  According to BMC, Mahoney was responsible for sales of and involved in marketing and go-to-market strategies for four of the company's five product lines.  (Hardy Decl. ¶¶ 6-7.)  BMC emphasizes that he contributed to and participated in high-level and confidential leadership development opportunities aimed at "organizational restructuring into a matrixed organization to support specific go-to-market strategies."  (Kidder Decl. (Docket No. 9) ¶ 9; see also Hardy Decl. ¶ 9.)  According to Mahoney, he worked strictly in a sales capacity and had no involvement with marketing or go-to-market strategies.  (Mahoney Aff. ¶ 22.)  In other words, he insists that he merely directed his team to take BMC's available products and marketing strategies and apply that information and their skills to sell the products. (Id.)  Mahoney also avers that the leadership practices were announced to all employees

and implemented with customers, or were commercially available sales training, and therefore not confidential.  (Id. ¶¶ 35, 39-43, 56, 73-75, 78-86.)

The parties dispute the level of Mahoney's access to confidential information, and whether that information was confidential, in the new role.  BMC alleges that Mahoney could obtain additional information related to the U.S. market, including expanded customer lists, employee data on his direct reports, area sales forecast and pipeline information, and territory-specific plans and strategies.  (Hardy Decl. ¶ 5.)  Mahoney counters that the information he had access to while in the United States was no different than the information he had access to while in Canada.

The parties dispute what drove Mahoney's success at BMC.  Mahoney posted sales numbers of 225% of his quota and increased the Midwest business 295% annually.  (Kidder Decl. ¶ 9.)  BMC urges that Mahoney's access to its confidential information and training on its unique leadership practices fueled his success.  (Id.)  Mahoney points to his own years of experience as a salesperson and the sales techniques he brought to BMC as the foundation of his success.  (Mahoney Aff. ¶¶ 76, 87.)

And the parties dispute the significance of Mahoney's attendance at BMC's Sales Kickoff event held in Las Vegas in April 2015.  (Hardy Decl. ¶ 10; Kidder Decl. ¶ 10.)  There, he sat in on both general and breakout sessions.  According to Mahoney, the general sessions were unsecured and open to all employees, customers, resale partners, and consultants.  (Mahoney Aff. ¶ 62.)  But according to BMC, the breakout sessions were confidential, where BMC executives outlined the company's strategic direction, product development, marketing content, and go-to-market plans for the coming 12 to 36

months.  (Hardy Decl. ¶ 10; Kidder Decl. ¶ 10.)  The executives also discussed BMC's product strengths and weaknesses and instances when customers were satisfied or dissatisfied.  (Id.)  Mahoney highlights that an outside reseller presented at one of the breakout sessions (Mahoney Aff. ¶¶ 63-64), but BMC notes that the reseller has a nondisclosure agreement with the company (Goldberg Decl. (Docket No. 19) ¶ 3).  At the event's conclusion, Mahoney won the Chairman's Circle Award and the Regional Sales Manager of the Year for North America Award.  (Hardy Decl. ¶ 15; Kidder Decl. ¶ 7.)

## C.    Mahoney's Leaving BMC for ServiceNow

Less than two weeks after the Sales Kickoff, Mahoney announced that he was leaving BMC for ServiceNow, Inc.  (Hardy Decl. ¶ 4; Kidder Decl. ¶ 11.)  ServiceNow is a direct competitor of BMC on three of the four product lines that Mahoney sold.  (Hardy Decl. ¶ 8; Kidder Decl. ¶ 5.)  Indeed, BMC is pursuing a separate patent-infringement lawsuit against ServiceNow.  See BMC Software, Inc. v. ServiceNow, Inc., No. 2:14-cv-903 (JRG) (E.D. Tex. filed Sept. 23, 2014).

Mahoney told his supervisors that he would be leading ServiceNow's global information technology operations management business.  (Hardy Decl. ¶ 5; Kidder Decl. ¶ 11.)  He elaborated that the position focuses on sales, but would also have a marketing and strategic emphasis.  (Hardy Decl. ¶ 12; Kidder Decl. ¶ 6.)  While Mahoney denies that he will be working on marketing and go-to-market strategies, he concedes that he will have "input" on those functions.  (Mahoney Aff. ¶ 111.)

The day after Mahoney's announcement, May 5, 2015, was his last working day at BMC.  (Olmo Decl. ¶ 13.)  On his departure, Mahoney removed all BMC information

7

from his possession.  (Mahoney Aff. ¶¶ 99-100.)   He returned his work computer and external hard drive that contained work documents to BMC, deleted BMC contacts from his iCloud, and destroyed other BMC documents.  (Id.)   BMC has not alleged that Mahoney inappropriately took or continues to possess any documented confidential information or trade secrets.  Mahoney stayed on BMC's payroll until May 15, 2015. (Olmo Decl. ¶ 13.)

**D.     BMC's Lawsuit Against Mahoney**

BMC proceeded to sue Mahoney.  (Compl. (Docket No. 1).)  It alleged that Mahoney's position at BMC required the same responsibilities and knowledge that his position at ServiceNow will require: sales, marketing, and go-to-market strategies.  (Id. ¶¶ 4-51.)  And based on those allegations, it asserted claims for breach of contract (both on the noncompete covenant in the confidentiality agreements and on the deferred compensation agreements) and inevitable disclosure of trade secrets, and sought damages and injunctive relief.  (Id. ¶¶ 52-70.)

BMC now moves for a preliminary injunction, asking the Court to bar Mahoney from working for ServiceNow in a sales or marketing capacity within the United States until May 15, 2016, and from disclosing or using BMC's confidential information and trade secrets to compete against BMC.  The start date of Mahoney's position with ServiceNow has been postponed, presumably pending the resolution of this Motion.

**DISCUSSION**

In deciding whether to issue a preliminary injunction, the Court weighs four factors: (1) the likelihood of the moving party's success on the merits, (2) the threat of

irreparable harm to the moving party without injunctive relief, (3) the balance between that harm and the harm injunctive relief would cause to the other parties, and (4) the public interest. Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981). The fundamental question is whether "the balance of equities so favors" the moving party that justice compels the Court "to intervene to preserve the status quo until the merits are determined." Id. Thus, a preliminary injunction is an extraordinary remedy, and the moving party bears the burden of showing that all the Dataphase factors warrant an injunction. Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003).

## A.    Likelihood of Success on the Merits

Of the two claims under which BMC seeks injunctive relief—breach of the noncompete covenant in the confidentiality agreement[2] and inevitable disclosure of trade secrets—it has shown that it will likely succeed on the merits of only the noncompete claim. To show that a claim is likely to succeed on the merits, the moving party must prove that the claim has a "fair chance" of prevailing, Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 732 (8th Cir. 2008) (quotation marks omitted), but need not establish a "greater than fifty percent" probability that it will prevail, PCTV Gold, Inc. v. SpeedNet, LLC, 508 F.3d 1137, 1143 (8th Cir. 2007) (quotation omitted).

---

[2] BMC claims that Mahoney's employment with ServiceNow breaches the noncompete covenant in both the 2010 and 2012 confidentiality agreements. But BMC is unlikely to ultimately demonstrate that the 2010 confidentiality agreement survived the 2012 version. The 2012 confidentiality agreement is therefore the relevant version in this dispute, and the Court will analyze BMC's noncompete claim under that agreement.

### 1.      Noncompete Claim

BMC has submitted enough evidence to present a fair chance that the noncompete covenant is enforceable, as modified below, and that Mahoney's employment with ServiceNow breaches the covenant.

### a.      Applicable Law

As to the merits of the noncompete claim—a substantive matter of state law—the parties contest which law should apply.  BMC argues that Texas law, the law chosen in the confidentiality agreement, should govern.  Mahoney argues that Minnesota law, the law of the forum state, should govern.  Texas and Minnesota law apparently conflict on the issue of consideration for a noncompete covenant.  When two or more differing states' laws could apply to a substantive issue, the Court looks to the conflict-of-law principles of the state where it sits.  Interstate Cleaning Corp. v. Commercial Underwriters Ins. Co., 325 F.3d 1024, 1028 (8th Cir. 2003).

Under Minnesota conflict-of-law principles, the contractually agreed-to Texas law should apply.  Minnesota courts traditionally honor choice-of-law provisions.  Milliken & Co. v. Eagle Packaging Co., 295 N.W.2d 377, 380 n.1 (Minn. 1980) (expressing that Minnesota courts are "committed to the rule that parties may agree that the law of another state shall govern their agreement" (quotation omitted)).  And despite their disfavor of noncompete covenants as partial restraints on trade, Minnesota courts have upheld choice-of-law provisions for noncompete covenants as well as preliminary injunctions respecting those covenants.  See, e.g., Medtronic, Inc. v. Advanced Bionics Corp., 630 N.W.2d 438, 450-456 (Minn. App. 2001) (enforcing a choice-of-law provision for a

noncompete covenant after extensively analyzing Minnesota's five-factor analysis for substantive conflict-of-law issues).

Mahoney protests the application of Texas law, diverting the Court's attention to another decision in this District, Menzies Aviation (USA), Inc. v. Wilcox, 978 F. Supp. 2d 983, 996-997 (D. Minn. 2013) (Davis, C.J.), which characterized itself as the "rare case" where the choice-of-law provision for a noncompete covenant would not govern. But in Menzies, the parties hastily signed the noncompete covenant, and the covenant was a contract of adhesion. Id. None of those circumstances exist here. Mahoney visited BMC's Texas headquarters for work purposes (see Ibanez Decl. (Docket No. 20) ¶¶ 3-4), waited a month before signing the confidentiality agreement containing the noncompete covenant, and consented to the agreement's choice-of-law provision voluntarily. Giving effect to the parties' objective contractual expectations of what law would govern, the Court will enforce the choice-of-law provision in the confidentiality agreement and apply the law of Texas.

### b.     Enforceability of the Noncompete Covenant

To promote economic competition, Texas law permits reasonable restrictions on an employee's ability to work for his or her employer's competitor. Marsh USA Inc., v. Cook, 354 S.W.3d 764, 769-70 (Tex. 2011) (reasoning that valid noncompete covenants balance the employee's interests in taking advantage of professional mobility and earning a living with the employer's interests in developing innovative products and customer relationships and protecting those investments from a competitor). The enforceability of a noncompete covenant in Texas, as dictated by statute, depends on two criteria:

> [1] it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made [2] to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

Tex. Bus. & Com. Code § 15.50(a).

### i.      Ancillary to an Otherwise Enforceable Agreement

The threshold inquiry under the statute asks whether there is an "otherwise enforceable agreement" between the parties and, if so, whether the noncompete covenant is "ancillary to or part of" that agreement.   Marsh, 354 S.W.3d at 773.   The Texas Supreme Court found that both of those requirements were met in a case that resolves the issue here.   See Alex Sheshunoff Management Services, L.P. v. Johnson, 209 S.W.3d 644 (Tex. 2006).

In Johnson, the employer and employee had an at-will employment relationship. Id. at 645.  A few months after the employee started the position, the employer provided and the employee signed an employment agreement containing a noncompete covenant. Id.   Under the agreement, the employer promised to give the employee access to confidential information and the employee promised not to disclose that information.  Id. at 649.   The employer later gave the employee access to the confidential information throughout his employment.   Id. at 655.   The Texas Supreme Court upheld the noncompete covenant.   Id. at 648-56.   The covenant was ancillary to the employment agreement because the employer's promise to provide information was related to its interest in protecting its confidential information and goodwill, and the covenant was designed to enforce the employee's return promise not to disclose that information.  Id. at

649. And the at-will employment agreement—a unilateral contract—was an otherwise enforceable agreement even though it was not immediately enforceable when made. Id. at 650-51, 655. The other agreement could become enforceable in the future "by performance"—namely, the employer's actual provision of confidential information. Id. at 650-51.

The employment relationship between BMC and Mahoney mirrors that in Johnson. Mahoney's employment at BMC as regional sales manager was at will. Two months into the position, he signed the confidentiality agreement containing a noncompete covenant. Under the agreement, BMC promised to give Mahoney access to confidential information in exchange for his promise not to disclose that information. And thereafter, BMC gave Mahoney access to confidential information. Mahoney repeatedly denies that the information was confidential or that it was any different than what he had access to at BMC Canada. But BMC has sufficiently shown that, even setting aside the training he received, Mahoney had access to confidential product, customer, and partner information related to sales, marketing, and go-to-market strategies and tailored to his Midwestern customers. That provision of information constitutes the necessary consideration for the noncompete covenant under Johnson.

Nonetheless, Mahoney insists that the noncompete covenant lacks consideration because he signed the confidentiality agreement two months after he accepted the regional-sales-manager position and received no bargained-for additional benefits for doing so. Under Texas law, that argument holds no water. As just explained, Texas courts have found independent consideration to support a noncompete covenant in a

similar ongoing at-will employment scenario.  <u>See also</u> <u>Marsh</u>, 354 S.W.3d at 651 (seeing

"no reason" under the statute that, while an employer should not "spring a non-compete

covenant on an existing employee and enforce such a covenant absent new consideration

from the employer," the consideration can be later "provided by performance" of a

promise made in exchange for the noncompete covenant).

In any event, the "central focus" of the enforceability inquiry under Texas law is

not on "overly technical disputes" of whether the noncompete covenant is ancillary to an

otherwise enforceable agreement, but rather whether it is reasonable in scope of time,

geography, and activity.   <u>Johnson</u>, 209 S.W.3d at 655-56.   The Court turns to the

reasonableness of the noncompete covenant.

### ii.      Reasonable Limitations on Time, Geography, and Activity

A noncompete covenant's limitations on time, geography, and activity must be

reasonable and no greater than necessary to protect the employer's legitimate business

interests.  <u>Marsh</u>, 354 S.W.3d at 777.   Business interests worthy of protection include

"trade secrets, confidential information[,] or goodwill."  <u>Id.</u> at 775.   If the limitations are

unreasonable or overbroad, the Court may modify them and enforce them as modified.

Tex. Bus. & Com. Code § 15.51(c).   The noncompete covenant here restricts Mahoney

from working at a BMC competitor for one year after leaving BMC, within the United

States, and in a sales or marketing capacity.

Mahoney concedes that the noncompete covenant's one-year limitation is

reasonable.  And indeed, Texas courts have determined that durations of up to three years

are reasonable.  See Elec. Data Sys. Corp. v. Kinder, 360 F. Supp. 1044, 1050 (N.D. Tex. 1973); Evan's World Travel, Inc. v. Adams, 978 S.W.2d 225, 233-34 (Tex. App. 1998).

Mahoney objects to the noncompete covenant's geographic limitation—the entire United States—as overbroad.  The Court agrees.  "Generally, a reasonable area for purposes of a covenant not to compete is considered to be the territory in which the employee worked while in the employment of his employer."  Curtis v. Ziff Energy Grp., 12 S.W.3d 114, 119 (Tex. App. 1999).  At BMC, Mahoney was in charge of customer accounts in four to six Midwestern states.  At ServiceNow, however, he is poised to lead the company's business efforts globally.  Mahoney's regional work at BMC does not justify a national ban on his work at ServiceNow.  Even if the Midwestern customers had national operations, Mahoney's duties did not extent to customers based in the rest of the United States.  And restricting Mahoney from working with his former BMC customers in his new job will cover those customers' operations wherever they occur.  The Court will modify the noncompete covenant to reach only his former accounts.

Mahoney also contests the noncompete covenant's limitation on his ability to do both sales and marketing activities at ServiceNow.  According to Mahoney, there is a stark contrast between sales and marketing, and because he conducted sales at BMC, the covenant's reference to marketing is unnecessary to protect BMC's business interests. Mahoney overstates matters.  For one, the Court cannot so easily draw a line between sales and marketing.  While marketers promote products and salespeople sell products, salespeople need marketing materials to effectively communicate to customers and marketers need sales results to assess whether their materials were attractive to

customers.  Each function requires knowledge of the other.  Moreover, the noncompete covenant covers not just "becom[ing] employed for the purposes of" marketing but also "assist[ing] with" marketing.  (Olmo Decl. Ex. B at 4.)  Although Mahoney's main role at BMC may have been sales, he was certainly privy to marketing strategies.  And he admits that he will have input in marketing strategies at ServiceNow.  His knowledge of BMC's marketing strategies could therefore give ServiceNow an unfair competitive advantage and warrants a noncompete covenant that covers both sales and marketing activities.

Based on Mahoney's duties as regional sales manager at BMC and his prospective duties as global sales manager at ServiceNow, the noncompete covenant is geographically overbroad but otherwise reasonable in time and activity.  To strike a more appropriate balance between Mahoney's right to work and BMC's right to protect its legitimate business interests, the Court modifies the noncompete covenant to restrict Mahoney from working at a BMC competitor for one year after leaving BMC, with his former BMC Midwestern customers, and in a sales or marketing capacity.

### iii.    Other Challenges to Enforceability

Mahoney attacks the enforceability of the noncompete covenant on two additional yet unavailing grounds unrelated to the Texas statute.

First, Mahoney contends that the noncompete covenant is a contract of adhesion. According to Mahoney, he felt pressured to sign the confidentiality agreement because BMC imposed it on him after he moved his family to the United States, once he started the new position, and on a "take it or leave it basis."  But to establish an adhesion contract under Texas law, a party must show that it "has absolutely no bargaining power

16

or ability to change the contract terms." In re H.E. Butt Grocery Co., 17 S.W.3d 360, 370-71 (Tex. App. 2000); see also Holeman v. Nat'l Bus. Inst., Inc., 94 S.W.3d 91, 100 (Tex. App. 2002) ("[M]ere inequality of bargaining power is not sufficient, standing alone, to render a contract fundamentally unfair or unreasonable."). Mahoney, who had experience with noncompete covenants (having agreed to one in 2010), has not alleged that he had no opportunity to negotiate the terms of the noncompete covenant. And even if he did not have that opportunity, an adhesion contract is not automatically unconscionable or void—the party "must prove more than that the contract was offered on a take it or leave it basis." Serv. Corp. Int'l v. Lopez, 162 S.W.3d 801, 809 (Tex. App. 2005). Though Mahoney may now regret having signed the confidentiality agreement, he has presented no evidence that the noncompete covenant was otherwise a product of adhesion.

Second, Mahoney contends that the merger clause in the deferred compensation agreements wipes out the noncompete covenant. Basic principles of contract interpretation dictate otherwise. Though the merger clause states that each deferred compensation agreement "constitutes the entire agreement between" Mahoney and BMC, it narrows that statement "to the subject matter of" the agreement. (Olmo Decl. Ex. C. at 9.) The merger clause can therefore not encompass the noncompete covenant because the subject matter of the noncompete covenant—Mahoney's ability to compete with BMC post-employment—differs from the subject matter of the deferred compensation agreements—Mahoney's entitlement to stock and cash awards. And though the deferred compensation agreements allow BMC to claw back those awards if Mahoney violates

17

separate noncompete conditions (<u>id.</u> at 3-4), they nonetheless reference the noncompete covenant in a way that endorses its continued vitality (<u>id.</u> at 3).  Mahoney's reliance on <u>R. Ready Prods., Inc. v. Cantrell</u>, 85 F. Supp. 2d 672, 693-94 (S.D. Tex. 2000), which involved a broader merger clause without any subject-matter limitation, is misplaced.

### c. Breach of the Noncompete Covenant

Having concluded that the noncompete covenant, as modified, is enforceable, the Court must also address whether BMC is likely to show that Mahoney's position at ServiceNow breaches the covenant.  The parties may weave different versions of Mahoney's responsibilities at ServiceNow.  But at bottom, he will be leading ServiceNow's global business efforts, focusing on sales and having input on marketing and go-to-market strategies for products that compete with BMC's products.  Those responsibilities fall under the noncompete covenant's restrictions.  Mahoney's job at ServiceNow, for the purposes of this Motion, will thus breach the noncompete covenant.

### 2. Trade-Secrets Claim

BMC has not submitted enough evidence, however, to present a fair chance that Mahoney will inevitably disclose any of its trade secrets in his employment with ServiceNow.  It has not specifically identified any customer, product, or resale information that, although perhaps constitutes confidential information under the noncompete covenant, rises to the level of a trade secret.  <u>See</u> <u>Lexis-Nexis v. Beer</u>, 41 F. Supp. 2d 950, 958 (D. Minn. 1999) (Doty, J.) (articulating the three-factor test for determining whether a trade secret exists).  Nor has it established that Mahoney, who undisputedly does not possess any documented trade secret, will probably disclose any

trade secrets to ServiceNow.  See Int'l Bus. Mach. Corp. v. Seagate Tech., Inc., 941 F.

Supp. 98, 1001 (D. Minn. 1992) (explaining that merely "showing that [the employee]

has knowledge of trade secrets" does not warrant an injunction).

Despite BMC's failure to show that it will likely succeed on its trade-secrets

claim, it has made that showing on its noncompete claim and may receive injunctive

relief on the basis of that claim.

**B.     Threat of Irreparable Harm, Balance of Harms, and Public Interest**

In light of the Court's modification of the noncompete covenant, the analysis of

the remaining Dataphase factors is straightforward.  BMC faces the risk of losing market

position and customer goodwill if Mahoney were to use his knowledge of BMC's sales

and marketing strategies and relationships with BMC's Midwestern customers to the

benefit of ServiceNow.  See Boston Scientific Corp. v. Duberg, 754 F. Supp. 2d 1033,

1041 (D. Minn. 2010) (Kyle, J.) ("Irreparable harm may be inferred from breach of a

valid non-compete agreement if the former employee obtained a personal hold on the

good will of the former employer." (quotation omitted)).   By contrast, Mahoney will

merely suffer the inability to sell or market to his former Midwestern customers for one

year, which should not materially interfere with his ability to perform his other, more

global duties at ServiceNow.  And the public interest demands "enforcement of valid

business agreements and the protection of legitimate business interests in an industry,"

like the software sector, "propelled by vigorous but fair competition."   Id. at 1042

(quotation omitted).

**CONCLUSION**

The <u>Dataphase</u> factors weigh in favor of a preliminary injunction.  BMC has shown that the likely success of its noncompete claim, the relative harms to the parties, and the public interest justify enforcing the noncompete covenant as modified above. Accordingly, **IT IS HEREBY ORDERED** that:

1. BMC's Motion for a Preliminary Injunction (Docket No. 5) is **GRANTED** to the extent ordered below;

2. Mahoney is **ENJOINED** from working at ServiceNow in any sales or marketing capacity related to BMC's Midwestern customer accounts for which he was responsible until May 15, 2016; and

3. Under Fed. R. Civ. P. 65(c), to secure the issuance of this injunction, BMC must post a bond in the amount of $50,000 within five business days from the date of this Order.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: <u>June 9, 2015</u>                    *s/ Paul A. Magnuson*
                                              Paul A. Magnuson
                                              United States District Court Judge